MOORE et al. *v.* GRILLIS.

In Banc. Mar. 28, 1949.

(39 So. (2d) 505)

866

W. D. Conn, Jr., for appellants.

Allan **T. Edwards,** for appellees.

**Smith, J.**

This case is concerned with the statutes of this State dealing with the right of others than ''Certified Public Accountants'' to prepare, and accept compensation for preparing, tax returns. A constitutional question is involved. The case originated in a justice of the peace court.

Appellants are not Certified Public Accountants. However, as we understand the record, they contracted with appellee to prepare his 1946 income tax returns, and they fully performed their agreement. For their services, appellee promised to pay them the sum of $275, and he did pay them $140 of this amount. For the unpaid balance of $135, upon refusal or failure of appellee to pay it, appellants brought this action in the court of a justice of the peace, and recovered judgment there for the same. Appellee thereupon appealed to the county court.

In the county court, appellee filed the following plea:

"Now comes the defendant, by its attorney, and for plea in its behalf in the above numbered cause, says;

"The services that plaintiffs contracted to render were those that can be lawfully rendered only by accountants who have qualified as provided by Chapter 12 Title 32 of Mississippi Code of 1942; Sections 8905 through 8912.

"Plaintiffs have not so qualified and not having qualified are specifically enjoined not to make, utter, issue, or certify balance sheet, statement of assets or liabilities or any statement of income or loss; or prepare or make any tax return. Said contract was therefore in violation of the laws of the State and therefore against public policy. All of this defendant is ready to verify.

"Wherefore, the defendant prays that this suit be dismissed at the cost of plaintiffs."

To this plea, appellants demurred on the basis of the claimed unconstitutionality of the statutes, cited in the aforesaid plea of appellees, assigning the following reasons:

"1. The Statute set up in the plea is not a valid exercise of the police power of the State;

"2. The statute pleaded violates the constitutional provisions prohibiting the granting of exclusive privileges and immunities;

"3. The statute pleaded violates the constitutional right of citizens to liberty and the pursuit of happiness;

"4. The statute pleaded unconstitutionally restricts the right of private contract."

The county court overruled this demurrer, and in due course followed a judgment there for appellees,—and the appellants here then appealed from the judgment of the county court to the circuit court, and the county court was affirmed in that court, whence appellants, on proper certificate of a constitutional issue, appealed to this Court.

By Chapter 211, Laws of 1920, the Legislature passed an act now embraced in Sections 8905-8911, inclusive, of the 1942 Code. Section 8906 established a Board of Public Accountancy, consisting of three members, and by Section 8907 prescribed its powers and duties, and provided for examinations of applicants to engage in public accountancy as Certified Public Accountants, and the issuance of a certificate to successful applicants. Section 8905 authorized: "Any citizen of the United States, residing or having a place for the regular transaction of business in the state of Mississippi being over the age of twenty-one years, of good moral character, and who shall have received from the state board of public accountancy a certificate of his qualifications to practice as a public accountant as hereinafter provided, shall be styled or known as a certified public accountant, and it shall be unlawful for any other person or persons to assume such title or use any letters, abbreviations or words to indicate that such a one using same is a certified public accountant."

By Section 8911, it was made a criminal offense for any person to represent himself to the public as having received a certificate as provided in this Chapter, Chapter 12, Title 32, Code 1942; or to assume to practice as a Certified Public Accountant; or to use the abbreviation, C.P.A., or any similar words or word, letters or letter, to indicate that the person using the same is a Certified Public Accountant, without having received the requisite original or renewal certificate.

It will be seen from the foregoing résumé of the pertinent sections of this legislation that the Act of 1920 established a special class of accountants as Certified Public Accountants, and provided for the regulation of that class, but provided no regulations for accountants, public or otherwise, not in that class. The benefit thereby extended to those qualifying under it, is that they obtain a certificate as to their competency and fitness, which serves further as an authoritative recommendation of their efficiency and qualifications.

The law, as passed in 1920, did not require that accountants, public or private, pass such examination and obtain a certificate before practicing the profession of accountancy. It provided merely the privilege as a voluntary one for those interested. Neither did it purport to prevent or punish the practicing of accountancy without a certificate from the board, but forbade the holding of oneself out to the public as possessing the certificate which the board was authorized to issue under the provisions of the act; and barred practicing as a Certified Public Accountant, and the using of the abbreviation C.P.A., or similar words or letters of designation, in order to deceive the public into believing that the person so acting was a Certified Public Accountant under the law, but who had not first successfully passed the requisite examination by the State Board of Accountancy, and certified by it. So far as the provisions of Chapter 211, Laws 1920, Sections 8905-8911, Code 1942, are concerned, see State v. De Verges, 153 La. 349, 95 So. 805, 27 A. L. R. 1526.

The Supreme Court of Oklahoma, in 1924, called attention to the fact that every state in the Union had a law regulating accountancy, similar to the law of that state. The Oklahoma statute was in all pertinent and material aspects the same as the law of this State, supra. However, the Oklahoma Supreme Court very cogently observed that at that time, ". . . no other state had attempted to prohibit the practice of the profession by

those not certified." State ex rel. Short, Attorney General, et al. v. Riedell, 109 Okl. 35, 233 P. 684, 686, 42 A. L. R. 765.

In the 1930 Code of this State appeared, for the first time, Section 5918, now Section 8912, Code of 1942. In this amendment to the Chapter on Public Accountancy, the Legislature of Mississippi did attempt to prohibit the "practice of the profession (of accountancy) by those not certified." It is there enacted "That it shall be unlawful for any person, *except a certified public accountant*, who has complied with the requirements of this chapter, or an attorney in the practice of law in this state, ·or their employees, to charge or receive, directly or indirectly, a fee or special compensation for . . . *making any tax return.* If any person who at the time of making the charge or receiving such fee or compensation has not,· by virtue of the provisions of this chapter, authority to practice as an attorney ˙or *certified public accountant* hereunder, or any employee of such attorney or certified public accountant, shall charge or receive, directly or indirectly, a fee or special compensations,— . . . (c) *for making or preparing any tax return;—* shall be guilty of a misdemeanor, and upon conviction therefor be punished by a fine of not less than fifty dollars or not more than five hundred dollars, or by imprisonment in the county jail for not less than ten days or for not more than six months, or by both such fine and imprisonment in the discretion of the court." (Italics supplied.) The statute further makes provision under the so-called "Grandfather Clause" for the practice, as Certified Public Accountants, of those having a regularly established business as· a public accountant on or before February 28, 1931, upon filing notice, and so forth.

In its ultimate and final analysis, this statute brands as criminal the "making or preparing [of] any tax return" except by lawyers and *Certified Public Accountants* or their employees; *for compensation.*

It is to be observed that the effect of Section 8912 is that Certified Public Accountants are put in a privileged class, which permits them to charge for services in preparing "any tax return." On the other hand, those not Certified Public Accountants are placed in an underprivileged class, without the right to charge for services in preparing "any tax return", on the penalty of becoming criminal and subject to heavy penalties. The Act does not, therefore, apply equally to all public accountants, or those engaged in making and preparing tax returns. Laws regulating the nursing profession have been upheld, where the right to use the initials "R. N.", standing for "Registered Nurse", was established,— yet practical nurses were not prohibited. Regulation of the teaching profession has always been recognized as within the constitutional power of the Legislature. However, will anyone contend that a statute providing that only teachers who have been awarded a Phi Beta Kappa Key could teach in the schools of this State and receive compensation, and that all others could constitutionally be prohibited from receiving compensation, with a criminal penalty, if they so taught? We have members of the bar with degrees of LL. B., and those without, and both subject to regulation under the State Police Power. Can it be successfully argued that a constitutional law can be passed which would limit the right to charge a fee for services to that class of lawyers who have LL. B. Degrees, and make it a criminal offense for those without such degree to accept compensation for similar services? Such discriminations surely could not escape condemnation as being arbitrarily discriminatory, and without a reasonable relation to the public health, safety, convenience, general prosperity, or public morals. Certainly section 8912 benefits Certified Public Accountants, but is detrimental to those not certified.

We have the right to make use of knowledge of the popular and general customs of the people of this State, and public conditions therein. It is well known

that there are few populous cities in Mississppi, and in such centers *Certified Public Accountants* do, as a matter of business expediency, generally have their offices, in order to cater to a potential clientele of suitable proportions to earn them a satisfactory competence. On the other hand, there are scores and scores of small communities without any Certified Public Accountants, and whose inhabitants have neither the time, the financial ability, nor the need to leave their homes and places of business to travel to the offices of Certified Public Accountants, more or less distant from them, or to bring such accountants to their small village or town, as the case may be. It is, of course, further well known that thousands of people in the State of Mississippi must compulsorily make and fill various forms of ''tax returns'', both to the State and Federal Governments, and need assistance in so doing. If they do not file these returns, they become liable to National and State penalties. It is not optional with them. What then? · We all know the answer. Accountants, bookkeepers, insurance agents, notaries public, and others including local attorneys, must be called upon to aid in preparing their ''tax returns.'' And they, except for Section 8912, could legally charge and receive compensation for such valuable services.

The lawyers and Certified Public Accountants can so charge, but not the others. If the others do charge and receive compensation, they become criminals by so doing. Yet, there are not enough Certified Public Accountants in this State to render these services to multiplied thousands of our people. ██ ██ Can it, therefor, be fairly contended that Section 8912 has a reasonable relation to the promotion of the public convenience, the general prosperity, the public health, the public morals, or the public safety? It must have, in order to come within the police power of the State, and survive under the constitution. On the other hand, is it not potential as a detriment to, and impairment of, the general welfare of our citizens,

favoring only the class of accountants who are Certified Public Accountants, in whom it tends to establish a monopoly, except for attorneys, if the statute be sustained as constitutional?

The effect on the uncertified accountant is definite and certain. He is prohibited from receiving compensation for his services, and those dependent upon him are deprived of the fruits of his practical or professional skill or knowledge. This could conceivably go, in the case of uncertified public accountants, to the extent of forcing such accountants to be compelled to change their occupations, sacrificing years of training, experience, and investment in their business establishment,—and all because they are not Certified Public Accountants. This presents the incongruous and paradoxical situation that the Act of 1920 does not require one to become a Certified Public Accountant, but only prohibits the representation that he is such; while the amendment of 1930 subjects him to criminal prosecution for charging for services, because he is not a Certified Public Accountant. By this observation, we are not to be considered as hazarding the opinion that change in the statute in conformity therewith would overcome the constitutional infirmity.

We recognize that it is not for the courts to decide whether a law is needed and advisable in the general government of the people. That is solely a matter for the wisdom of the Legislature. But, it is our duty to construed the law and apply it to the case presented, and determine whether the Constitution of this State authorizes the legislation. That is what we must do in the instant case. As we have declared, if a statute purporting to protect public health, morals or safety, has no real relation to those objects, or is a palpable invasion of rights secured by fundamentl law, courts must so adjudge and thereby give effect to the Constitution. Town of McCool v. Blaine, 194 Miss. 221, 11 So. (2d) 801. In this connection, it is necessary to bear in mind a State Constitution does not grant specific legislative powers, but

limits them. Farrar v. State, 191 Miss. 1, 2 So. (2d) 146.

The whole ultimate effect of Section 8912 is to prohibit uncertified accountants, or preparers of tax returns, from earning a living thereat, or, at least from receiving compensation therefor. Counsel for appellees contends that is a mere regulation. Regulation, it seems to us, is one thing, but prohibition of doing a thing, thereby eliminating the practice to be regulated, is another thing entirely. It is a common right of the people, to enjoy "Life, Liberty and the pursuit of Happiness," and the right of the citizens of this State to employ whom they choose to make their tax returns, even though one so employed be not a Certified Public Accountant, or attorney, is within those prerogatives of the people. The tax returns must be correctly prepared because they will be checked, and erors therein required to be corrected by the tax officials, State or Federal, to whom the returns must be submitted. This would be true, whether the service of preparing the tax return were rendered by a Certified Public Accountant, attorney, uncertified public accountant, or other persons. Certification of the accountant in making the return would possess no special sanctity there. "Cu jusvis hominis est errare"—any man may make a mistake. Cicero, Philippicae. No. xii, sec. 2. And, Fabius Maximus long ago pointed out that it is beyond man's powers to avoid all mistakes. Plutarch's Lives, Fabious, Ch. 13, Sec. 1. If such errors persistently occurred and recurred on the part of any person preparing such returns, with much frequency, this inefficiency would soon eliminate him from public demand in preparing tax returns, without the intervention of any state board. ■

■ "Liberty" within constitutional provisions against depriving any person thereof except by due process of law includes "liberty of contract," which, in turn, means freedom from arbitrary or unreasonable restraint. Constitution 1890, Section 14; U. S. C. A. Constitutional Amendment 14; Saucier v. Life & Casualty Ins. Co. of Tennessee, 189 Miss. 693, 198 So. 625.

Said the Supreme Court of Oklahoma further, in State ex rel. Short v. Riedell, supra [109 Okl. 35, 233 P. 690]: "When it is declared by law that private business concerns, in the employment of an accountant or auditor when deemed by them to be of advantage or to their interest must, in the interest of the general welfare, employ one certified by the state, it is for the reason that such private business so affects the general welfare as to the best interest of the public that their right of contract be limited in the employment of an accountant. It is, in effect, a regulation of private business concerns desiring an audit. An application of the same principle with the same results would justify legislation requiring private business concerns to submit to an audit, or to require them to have an audit made at stated times or under certain conditions. It would be the application of the same principle with the same results differing only in degree. There are certain corporations known as public service corporations which, in the interest of the general welfare, the federal and state governments have deemed it necessary to regulate by requiring them to submit to audits and make reports; but they have never gone so far as to say whom they shall or whom they shall not employ in matters of private concern. They have been left free to exercise their own judgment in selecting their employees, and no restrictions have been placed upon the right of any one to accept such employment. Heretofore private enterprises, including those classed as public service corporations, have been permitted to contract in matters affecting their private concern without any serious thought that such business, however small or extensive, sufficiently affected the public welfare as to justify depriving them of that right. American constitutional governments rest upon the right of private property. By 'private Property' is meant the right of absolute control of property. It includes the right of contract in matters concerning that property. It is true that the right of private property and the

right of private contract must yield when the public peace, health, safety, or general welfare renders it necessary; but no court has ever held, so far as we know, that reputable business enterprises, innocent in their nature, so affect the public welfare by success or failure as to justify their regulation to the extent of limiting them in their right to contract in matters purely of private concern.''

The Supreme Court of the United States said: ''A state cannot, 'under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful ocupations or impose unreasonable and unnecessary restrictions upon them.' '' Liggett Company v. Baldridge, 278 U. S. 105, 49 S. Ct. 57, 59, 73 L. Ed. 204.

As stated above, the statute of Oklahoma was very much like ours, including our Section 8912, Code 1942, and the Supreme Court of that State held the statute void, as violative of the Constitution. The Court there said: ''Our conclusion therefore, is that the act, in so far as it prohibits uncertified accountants from holding themselves out as professional or expert accountants or auditors for compensation or engaging in the practice of that profession, is in conflict with the spirit and express provision of the Constitution and void, in this, that it abridges the right of private property and infringes upon the right of contract in matters purely of private concern bearing no perceptible relation to the general or public welfare, and thereby tends to create a monopoly in the profession of accountancy for the benefit of certified accountants, and denies to uncertified accountants the equal protection of the laws and the enjoyment of the gains of their own industry. The defendants are not engaged in the exercise of a franchise, but a constitutionally guaranteed right.''

The Tennessee Supreme Court said in a similar case before it and we quote from its opinion:

''Complainant is invoking individual rights as a citizen to engage in a private business or vocation, without

unreasonable or arbitary restraint. In New State Ice Company v. Liebmann, 285 U. S. 262, 52 S. Ct. 371, 374, 76 L. Ed. 747, decided by the Supreme Court of the United States March 21, 1932, that court recognized the principle invoked by complainant:

"Plainly, a regulation which has the effect of denying or unreasonably curtailing the common right to engage in a lawful private business, such as that under review, cannot be upheld consistent with the Fourteenth Amendment. Under that amendment, nothing is more clearly settled than that it is beyond the power of a state, 'under the guise of protecting the public, arbitrarily (to) interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.' Jay Burns Baking Co. v. Bryan, 264 U. S. 504, 513, 44 S. Ct. 412, 412, 68 L. Ed. 813, 826, 32 A. L. R. 661, and authorities cited; Louis K. Liggett Co. v. Baldridge, 278 U. S. 105, 113, 49 S. Ct. 57, 73 L. Ed. 204, 208.''

It was held that the Tennessee statute requiring certificate and license by board of accountancy as conditions precedent to practice of public accounting was void as imposing an arbitrary restriction on right of private contract. Campbell v. McIntyre et al., 165 Tenn. 47, 52 S. W. (2d) 162, 163.

In a case involving practically the same principle of constitutional law, the Illinois Supreme Court has held there was no reasonable basis for discrimination between two stated classes of accountants, whereby one would become favored over the other. It was also held that the right to follow any of the common occupations of life is an inalienable right. It is one of the blessings of liberty. The Court recognized the well-established principle of constitutional jurisprudence, that the right to liberty, property and the pursuit of happiness is subject to the reasonable exercise of the police power of the state, but said: "The end to be secured by the exercise of the police power is the furtherance of the public health, com-

fort, safety, or welfare, and, unless an act restricting the ordinary occupations of the citizens can be shown to fall within the police power such act is void, as violating the right of the citizen to liberty and the pursuit of happiness.'' Continuing, the Illinois Court declared: ''We do not say that it is beyond the power of the General Assembly to enact a statute requiring that no one shall use the term 'certified public accountant' or the term 'public accountant' without having met the requirements of such an act. Such a provision may well be within the power of the Legislature on the ground that it is to the public interest that no one shall use a term indicating that he has been examined and certified as an accountant when such is not the fact.'' The part of the Illinois Statute discriminating in favor of such certified accountants against others not certified, in the practice of accountancy, was declared unconstitutional. Frazer v. Shelton, 320 Ill. 253, 150 N. E. 696, 701, 43 A. L. R. 1086.

Against these decisions, appellee cites a case from Wisconsin, Wangerin et al. v. Wisconsin State Board of Accountancy et al., 223 Wis. 179, 270 N. W. 57. There is sufficient difference between the legislation dealt with by the Wisconsin Court and our Mississippi Statute, Section 8912, Code 1942, to prevent our applying the reasoning of the Wisconsin Court to our statute, even if we agreed with it.

Appellant also cites Heller v. Abess, 134 Fla. 610, 184 So. 122, 124, wherein Heller, who was neither a Certified Public Accountant, nor a public accountant, under the Florida Laws, was enjoined from using any title which indicated or mislead people into believing he was a public accountant, statutorily so entitled. The Florida Court said: ''The statute is not, as contended, an arbitrary, unreasonable and oppressive exercise of the sovereign legislative power in forbidding the use by others of the business or professional title gievn under the statute only to those who duly qualify and pay a license tax to engage in the business, occupation or profession of public

accountant as regulated by the statute; such provisions being reasonable and appropriate to prevent imposition upon the public and to serve the general welfare.'' There is nothing in the Florida case presenting any difficulty in our conclusion here. We see nothing in the other citations by appellee which would justify any change of our views.

The State and Federal Governments, in a measure, have recognized the lack of a sufficient number of persons capable of aiding citizens in the preparation of Income Tax Reports, by sending out agents, from the State Tax Commission and the Bureau of Internal Revenue, respectively, to the county sites, in order to help in such tasks. But, for various reasons, among them being sickness, previous engagements, press of business, absence from home, and the limited number of such assistants and their limited time of availability, this service cannot supply the deficiency. It is well known that not enough members of the legal profession are willing to assist with small Income Tax Returns, which form the major portion of all such documents, to supply adequate aid to the public. So, recourse must still be had to others for assistance.

As stated, supra, Section 8912 is an infringement on the right of accountants not certified, and others engaged in preparing Income Tax Returns, to pursue their occupation gainfully; tends to establish a monopoly in Attorneys and Certified Public Accountants; and restricts the liberty of the people in respect to contract. Our Court, as far back as 1908, had something to say about this in dealing with privilege taxes on two differentiated classes of employment in the plumbing trade. This particular licensing law was held unconstitutional. There, we declared that: ''Liberty, in its broad sense, must consist in the right to follow any of the ordinary callings of life without being trammeled.'' We quoted with approval from State v. Smith, 42 Wash. 237, 84 P. 851, 5 L. R. A., N. S., 674, 114 Am. St. Rep. 114, 7 Am. Cas. 577, where

the Supreme Court of the State of Washington said: "The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence. It commenced with the fundamental proposition that all men are created equal; that they are endowed by their Creator with inalienable rights; that among these are life, liberty, and pursuit of happiness. This right is a large ingredient in the civil liberty of the citizen." In our opinion, we further characterized the condemned law by declaring it "not only unjust to the laborer, but it is equally wrong to the public." Wilby v. State, 93 Miss. 767, 47 So. 465, 466, 23 L. R. A., N. S., 677. We think the views above quoted apply with equal force here.

To summarize our views, we reiterate that Chapter 211, Laws 1920, Sections 8905-8911, Code 1942, constitutionally establish the class, Certified Public Accountants, and provide for their regulation. However, Section 8912 does not attempt to provide any code of rules for practice by other accountants, but destroys their right to charge compensation for their services in preparing Income Tax Returns,—which is destruction, not regulation.

Statutes may be constitutional and in operation with respect to some persons and state of facts, and unconstitutional as to others. 11 Am. Jur., Const. Law, Secs. 163, 164; Russell Inv. Corporation v. Russell, 182 Miss. 385, 178 So. 815, 182 So. 102; Lee v. Smith, 189 Miss. 636, 198 So. 296.

We hold, therefore, that so much of Chapter 12, Title 32, embracing Sections 8905 to 8911, inclusive, from Chapter 211, Laws 1920, is a valid exercise of the police power under the Constitution of 1890, and hence within the constitutional power of the Legislature to enact. ██ We declare to be violative of the Constitution, the 1930 amendment, or Section 8912, insofar as it affects the making and preparation of tax returns, as not being a reasonable exercise of the police power of the state; and

that it is arbitrarily discriminatory; not in promotion of the public welfare; and without reasonable relation to the advancement of the public convenience, the general prosperity, the public health, the public morals, or the public safety, and is therefore in violation of the Constitution.

Since the case before us involves only the making and preparation of tax returns, we limit expression of decision in this case to that particular phase of Section 8912.

The judgment of the circuit court is therefore reversed and the cause remanded.

Reversed and remanded.

**Hall, J.** (dissenting).

All section numbers herein mentioned have reference to the Mississippi Code of 1942, except when otherwise indicated.

The controlling opinion states that the Legislature has established a special class of accountants as "Certified Public Accountants" and has provided for the regulation of that class, but has provided no regulation for accountants, public or otherwise, not in that class. I am unable to agree with that conclusion. Section 8905 is under the Code Chapter entitled "Public Accountants" and provides, in part: "Public accountants—to regulate practice of.—Any citizen of the United States, residing or having a place for the regular transaction of business in the state of Mississippi being over the age of twenty-one years, of good moral character, and who shall have received from the state board of public accountancy a certificate of his qualifications to practice as a public accountants as hereinafter provided, shall be styled or known as a certified public accountant . . ." Section 8906 creates the state board of public accountancy, provides their qualifications, and designates their term of office. Section 8907 prescribes the powers and duties of said board and provides for the holding of examinations

at least twice each year for all applicants for certificates to practice as public accountants, which examinations shall cover a knowledge of the "theory of accounts", "practical accounting", "auditing", "commercial law as affecting accountancy" and such other branches of knowledge pertaining to accountancy as the board may deem necessary to maintain the highest standard of proficiency in the profession of public accounting; it then provides for the issuance of certificates to those who have successfully passed the examination. Section 8908 provides for payment of the expenses of the state board of public accountancy. Section 8909 provides for reciprocity with other states. Section 8910 provides how certificates previously issued may be cancelled or suspended. Section 8911 provides for penalties against any person who represents himself as having received a certificate as provided in the chapter *or who shall assume to practice as a certified public accountant* or who shall use the abbreviation "C.P.A." or any similar words or letters to indicate that he is a certified public accountant, without having received such certificate from the state board of public accountancy. Section 8912 makes it "unlawful for any person, except a certified public accountant, *who has complied with the requirements of this chapter*, or an attorney in the practice of law in this state, or their employees, to charge or receive, directly or indirectly, a fee or special compensation for making an audit, for making, uttering, issuing or certifying any balance sheet or any statement of assets and liabilities, or any statement of income (or loss); or for preparing or making any tax return". This section specifically excludes a person making statements of his own business; an officer or salaried employee of a firm, partnership or corporation making an audit, statement or tax return for the same; a bookkeeper making an audit, statement or tax return for his employer whose books he regularly keeps for a salary; a receiver, trustee or fiduciary as to an audit, statement or tax return with reference to the busi-

ness or property entrusted to him as such; and any federal, state, county, district or municipal officer as to any audit, statement, or tax return made by him in the discharge of the duties of such office.

From the foregoing it is seen that the legislature has not established a special class of accountants as Certified Public Accountants, but on the contrary that it has provided regulation for all public accountants. The controlling opinion capitalizes each of the words "Certified Public Accountants" but the statutes do not. It is perfectly clear from the foregoing statutes that the legislature has regulated the entire field of public accounting, that is to say, all persons who hold themselves out to the public as public accountants as defined in said section 8912. Nowhere in any of the cited statutes has the legislature set up certified public accountants as a special class and failed to provide regulation for public accountants who are not certified. What the legislature has done is simply this: It has regulated all public accountants and the whole profession of public accounting and has prohibited those who have not passed the examination required by statute from holding themselves out to the public as public accountants; it has provided that all persons who desire to practice public accountancy shall take an examination before the board upon the subjects pertaining to that profession, and to such applicants as may pass a satisfactory examination there is required to be issued "a certificate of his qualifications to practice as a public accountant" and upon passing such examination and receiving such a certificate the applicant is licensed to practice public accountancy and he shall then be known and styled as a certified public accountant. These are the exact words of the statute. It is the *certificate* which is issued by the board to the applicant that entitles him to style himself as a certified public accountant.

The majority opinion goes far afield when it compares these statutes with an assumed statute which would re-

quire all school teachers to hold a Phi Beta Kappa key or all members of the bar to hold the degree of LL.B. There is nothing in the statutes regulating public accountancy which requires an applicant to have attended a school of accountancy or to have attained a degree of C.P.A. The only requirement is that he shall pass a satisfactory examination, and be of good moral character. Mississippi regulates the practice of barbering, Sections 8725-8745, and requires in some respects a higher standard for barbers than it does for public accountants; for instance, a barber must not only be of good moral character but also of temperate habits, must have practiced as a registered apprentice under the immediate supervision of a registered barber for at least twelve months and must have passed a satisfactory examination conducted by the board of examiners to determine his fitness to practice barbering. Section 8730. In Clark v. State, 169 Miss. 369, 152 So. 820, 823, this court upheld the statutes regulating barbering, even to the extent of holding Clark criminally liable for practicing that profession without having ''received a certificate of registration'' as required by these statutes, and in so doing this court said:

''It is insisted that to require a license from a barber is an infringement upon the liberty of a citizen. An examination of all the authorities above demonstrates that the courts of this land are committed to the proposition that the legislative branch of the government as to its police power for the health, good morals, and general welfare of the state is vested with that power to regulate the various callings, trades, and professions therein. . . . The regulation of lawful trades or businesses is within the exercise of the police power of the state, and unless it is unreasonable in its nature, or so arbitrary in its enforcement on its face, that the property rights of citizens are unnecessarily and arbitrarily interfered with or destroyed, or their liberty unduly abridged, such

regulations are not beyond the police power of the state to adopt."

The controlling opinion states that "Section 8912 benefits Certified Public Accountants, but is detrimental to those not certified". It also manifests concern over the fact that accountants who are not certified are forced to change their occupations, sacrificing years of training, experience, and investment in their business establishment. But these statutes do not so require. It should be noted that accountants who are not certified under the law are not required to change their occupations; they are at perfect liberty to obtain private employment as accountants with any of the thousands of businesses and industries of the state, provided they have sufficient experience and qualifications to satisfy their employers. But if an accountant is not sufficiently versed in his profession to obtain the license required by our statutes, then the Legislature has determined that the public welfare demands that he should not be permitted to hold himself out to the public as a public accountant and thereby deceive the public into believing that he possesses special knowledge and skill in the field of accounting. All statutory regulations of the various businesses and professions are based upon the public welfare, yet the majority opinion concerns itself not with the public welfare but with the supposed rights of those who profess to have special training in accountancy but who do not have sufficient knowledge to pass an examination on public accountancy or to obtain and hold private employment as accountants. We should look to the public welfare and not simply to the welfare of those who are duly licensed and certified as accountants or those who are unable to obtain such a license. The public, in my opinion, is entitled to the protection afforded to it by these statutes. There is involved in this decision not merely the rights of uncertified public accountants, but the rights of that great body of the citizens of this state who are required to file tax returns. Severe penalties are in-

flicted by both state and federal law upon those whose returns are not properly prepared. Such a person is entitled to know that the one whom he engages to prepare his return has some knowledge of the income tax law and of accountancy. It may be true as assumed in the controlling opinion that there are not enough certified public accountants in this state to prepare income tax returns for every person who is required to file a return. However, there are approximately 1500 lawyers in this state and a very large number of these are engaged in the preparation of such returns for their clientele, as they are permitted to do by our statutes. Most of the large business houses and corporations have their own accountants who under private employment are not required to be licensed or certified and who prepare tax returns for their employers, as these statutes permit. Furthermore a large percentage of individual taxpayers have sufficient knowledge of their businesses to prepare their own returns. And, finally, both the state tax commission and the federal internal revenue department furnish numerous employees who go about over the state, on advertised schedules, and assist people in the preparation of their returns.

Complaint is made in the controlling opinion that certified public accountants locate only in the large centers of population, and that there are scores of small communities in the state where the services of such accountants are not available. Since lawyers and the representatives of the state tax commission and of the internal revenue collector are available to these small communities, can it be said that our law on public accountancy should be stricken down? What of the medical profession? During the recent war there was such a scarcity of physicians that it was almost impossible to obtain one, and this was particularly true in the small communities just mentioned; in fact, it is still true in these small communities, so much so that the state board of health is offering scholarships and special inducements

to physicians to locate in those communities for the service of the public. Now, does anybody suggest that because doctors are scarce in these small communities this court should strike down those provisions of our law which prohibit the practice of medicine without an examination and license?

It is stated in the majority opinion that our statutes regulating accountancy create a monopoly in favor of those who have been licensed and certified by the state board. That is true, but it is also true that all statutes regulating other professions likewise create monopolies. Physicians and surgeons are granted a monopoly on the practice of medicine, dentists on the practice of dentistry, and so on down the line on at least thirty businesses and professions which are regulated by statute in this state, but this monopoly is not for the protection of the physician or the dentist or the other business or professional man,—it is for the protection of the public. The public welfare is the chief consideration in all regulatory statutes, and, so far as I can find, no such statute has ever been declared unconstitutional simply because it tends to create a monopoly, except in the Oklahoma case hereinafter mentioned. The majority opinion stresses the constitutionality of statutes for the protection of public health, morals or safety, but makes little mention of those designed to promote the welfare of the general public.

Illustrative of some of the businesses and professions which are regulated in this state are architects, Sections 8632-8646, attorneys at law, Sections 8647-8684, barbers, Sections 8725-8745, embalmers, Sections 8776-8790, engineers, Sections 8791-8805, osteopaths, Section 8891, podiatry or chiropody, Sections 8894-8904, veterinarians, Sections 8914-8923, entomological work, including the control and eradication of termites, other insect pects and even rats, as well as landscaping and the setting of plants, pruning trees and doing tree surgery, Sections 5006-5011, jewelry auctioneers, Sections 5146-5152, credit unions,

Sections 5391-5428, the manufacture and sale of commercial fertilizers, Sections 4450-4474, the operation of burial associations, Sections 5592-5605, the sale of paint, Sections 5123-5131, the sale of gasoline and other petroleum products, Sections 5081-5122, and many, many others. A great many of these businesses do not involve either public health, public morals or public safety. Their regulation can be upheld only upon the ground that they involve the public welfare in that the public is entitled to be protected. If the public is entitled to know that the man who undertakes to eradicate termites from a house possesses special skill and knowledge in that field, or that the man who offers to prune trees or to trim off rotten spots for compensation is qualified to do that work, then why in the name of reason does not the public welfare and interest also require that the man who undertakes to fill out an income tax report for compensation shall possess sufficient knowledge in the field of accounting to properly do that work? Is not the public entitled to be protected against ignorance and incapacity in that highly specialized field of endeavor? The answer to these questions is found in 11 Am. Jur., Constitutional Law, Section 275, where it is said:

"Protection from Incapacity.—The power of the state to provide for the general welfare authorizes it to establish such regulations as will secure or tend to secure the people against the consequences of ignorance and incapacity. To that end it may exact a certain degree of skill and learning in professions and pursuits which concern the public health and welfare and are of such a character that a special course of study, training, or experience is needed to qualify one to pursue such callings. The possession of such qualifications is generally ascertained upon an examination of parties by competent persons or inferred from a certificate to them in the form of a diploma or license from an institution established for instruction on the subjects, scientific and otherwise, with which pursuits have to deal. The nature and extent of

the qualifications required must depend primarily upon the judgment of the state as to their necessity. If they are appropriate to the calling or profession and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to such calling or profession or are unattainable by reasonable study and application that they can operate to deprive one of his right to persue a lawful vocation. The right to regulate such professions and occupations extends to those engaged therein as well as to those seeking for the first time admission to their ranks, for it is generally recognized that no matter how long a person has been in the practice of a profession, he does not have any vested right to continue therein.''

Much emphasis is placed in the controlling opinion on the fact that Sections 8905-8911 inclusive were adopted originally as Chapter 211 of the Laws of 1920, while Section 8912 was adopted in 1930. As a matter of fact the penalizing portion of said Chapter 211 only prevents unlicensed or uncertified accountants from holding themselves out to the public as having been certified by the state board and in a general way prohibits the practice of public accounting without license, but is does not undertake to define what acts constitute public accounting. It may well be and probably was true that the legislature in 1930 realized that the original law did not have sufficient teeth in it to prevent the public from being imposed upon or misled by those who professed to be public accountants but who had not been licensed or certified pursuant to the law, and for this reason the legislature added Section 8912 so as to more particularly define what constitutes the practice of public accountancy. In the 1930 Code all the laws of this state were recodified and the laws regulating public accountancy were compiled under Chapter 150 thereof entitled ''Public Accountants''. All of Chapter 211 of the Laws of 1920 was brought forward as Sections 5911-5917, inclusive, of the 1930 Code and at

that time the legislature added thereto and placed in the same chapter Section 5918, which is the same as Section 8912 of the 1942 Code. It is quite plain that the original Chapter 211 of the Laws of 1920 was inadequate to protect the public against just such situations as have arisen in the case at bar. There was no law to define public accountancy and to prevent persons who styled themselves as accountants from serving the public for compensation. Having seen the necessity for such definition and for such protection of the public, after an experience of ten years with the original law, the legislature defined more fully what shall constitute the practice of public accounting and provided penalties against those who held themselves out as public accountants without having obtained from the state board a certificate of their competency. It is true that some of the earlier cases from other jurisdictions involve statutes quite similar to and in some instances almost identical with our 1920 statute, but it should be noted in this connection that not one court of this country has ever overthrown such a statute as being violative of the Constitution. The courts have consistently recognized the powers of the legislature to regulate the profession of public accounting. While the Oklahoma statute is not identical with ours, and while it undertook to creats three separate classes of accountants, the Supreme Court of that state is the only court that has ever declared unconstitutional a statute similar to Section 8912 of our 1942 Code. The Oklahoma statute did not prevent a person from holding himself out to the public as skilled in the preparation of income tax returns, which is the only point involved in the case at bar, and the Oklahoma court did not decide that point. Its decision was rendered in 1924 at a time when only the rich and near rich were required to file income tax returns, and at a time when the field of accounting affected only a small portion of the general public, and the decision is based upon general considerations such as the creating of monopolies, the right of private business to enter into

private contracts, etc., and it gave no consideration whatsoever to the rights of the general public which are vitally concerned in such legislation at this time a quarter of a century later.

The Illinois statute which was overthrown in the decision cited in the controlling opinion was in nowise similar to our statute. Under that statute no provision was. made for a citizen of that state to take an examination and qualify to practice his profession therein; he could never practice public accountancy unless he was already engaged therein on October 1, 1925, or unless he had passed an examination in another state and thereafter became licensed in Illinois under the reciprocity provisions of the act; furthermore the law provided that no accountant could work in private employment for more than one person at a time; if he was a bookkeeper, he was prohibited from keeping books for two or more small concerns. Solely because of this unwarranted and discriminatory provision of the Illinois law is was overthrown. The case did not involve any of the principles which appear in the case at bar.

The Tennessee case cited in the controlling opinion declared void only that part of the statute of that state which [165 Tenn. 47, 52 S. W. (2d) 163] "makes it unlawful for an accountant to render his services in accounting work to more than one employer, without first satisfying the board of accountancy of his qualifications for performing such service, and receiving its certificate." The whole decision was directed to that part of its opinion just quoted, and clearly it has no earthly application here for the reason that the Mississippi statutes do not prohibit an accountant from working in private employment for more than one person at a time.

So far as I can find the three cases last mentioned are the only ones in which statutes regulating public accountancy have been declared unconstitutional. No others are cited in the briefs or in the controlling opinion. However, numerous courts of this country have held that

it is within the power of the legislature to regulate public accounting. The following are some of the cases so holding: Lehmann v. State Board of Public Accountancy, 208 Ala. 185, 94 So. 94; State v. DeVerges, 153 La. 349, 95 So. 805, 27 A. L. R. 1526; People v. Marlowe, Sp. Sess., 203 N. Y. S. 474; Henry v. State, 97 Tex. Cr. R. 67, 260 S. W. 190; Heller v. Abess, 134 Fla. 610, 184 So. 122; Wangerin v. Wisconsin State Board of Accountancy, 223 Wis. 179, 270 N. W. 57, 60.

In the Wangerin case the Supreme Court of Wisconsin said:

"Plaintiffs complain because, as they say, they are demoted in their business if they seek certification as public accountants; that by obtaining such a certificate they are assigned to an inferior position in the profession. If they are so assigned, it is because of their qualifications, not because of the statute. If they are qualified, they may be licensed certified public accountants and take what they apparently regard as first rank in the profession. The statute might very well have required all persons who sought to practice public accountancy to comply with the statute and procure a license. The right to be certified as a public accountant is something in the nature of a privilege and a recognition of an existing status. Plaintiffs cannot complain because they are not given a status to which their qualifications do not entitle them. . . .

"A bookkeeper can do anything now that he could do before the chapter was enacted except that he cannot represent himself to be a public accountant. He can render the same service to his employers as any other accountant may render, but it cannot be put before the public as work of a public accountant or a certified public accountant. Chapter 135 deals solely with the relation of the practice of accountancy to the public, not to private individuals and firms. In Frazer v. Shelton, supra, the court made a study of several acts in different jurisdictions and it appears that there are statutes relating

to accountancy in Louisiana, Maryland, Michigan, North Carolina, Tennessee, Massachusetts, Pennsylvania, and New York. We call attention to this fact as indicating that the Legislature of the various states consider that the business of accountancy should be regulated in the public interest. As pointed out in the briefs of counsel the field of accountancy has become greatly enlarged and much more important than formerly. We now have income tax laws, estate and inheritance tax laws, legislation on the sale of securities—blue sky laws, social security legislation, and unemployment insurance with pay roll taxes, bank legislation, real estate brokers' laws, unfair trade practice acts, besides all of the work done by accountants in the field of rate regulation, insurance practice, public utility rates, sale of securities, largely resting upon the reputation of the accountants who do the accounting, and many other aspects of the matter which make the whole subject of public accountancy a proper field for the exercise of the police power in the interest of the public welfare.''

The controlling opinion herein quotes briefly from Louis K. Liggett Co. v. Baldridge, 278 U. S. 105, 49 S. Ct. 57, 73 L. Ed. 204, 205, but that case has no earthly application to the principle here involved. It dealt with a Pennsylvania statute which provided that no corporation, association or partnership may own a pharmacy or drug store unless all the partners or members are registered pharmacists; this statute undertook to regulate only the *ownership* of a drug store and did not attempt to regulate the practice of pharmacy which was covered by another and entirely different statute. Naturally the court held that the Pennsylvania law undertook to unlawfully and arbitrarily interfere with privite business.

My views of the instant case are aptly expressed by this court in the case of State v. J. J. Newman Lumber Co., 102 Miss. 802, 59 So. 923, 925, 45 L. R. A., N. S., 851. It is my opinion that the following quotations therefrom are a

complete answer to the position of appellant and to the controlling opinion herein:

"In considering questions like the present one, it is well for us to look at the organization of our nation. In forming our government, 'of the people, by the people, and for the people,' the individual surrendered many of his personal liberties. This was necessary. We could not have had government otherwise. No society can continue without its members being required to give up some of what they deem are their personal rights and liberties. We cannot imagine any successful government where every one has the privilege of doing what pleases him. Regulations and rules for the control of conduct accompany as a very necessity every organization. This truth applies, not only to an association of persons, but as well to the individual. Every person who succeeds finds it necessary to control his life by strong rules, sometimes very hard to obey. Recognizing all this, our forefathers, in their wisdom, planned to make the necessary rules for governing the people. They bestowed this power upon certain representatives of the people called legislators. In order to give stability to the statutes to be enacted, a Constitution, consisting of certain fundamental rules and regulations, was ordained and established. The general governing of the people was at the time and has continued in the several states, which together formed the Union known as the United States. Article 10 of the federal Constitution recognizes this when it states: 'The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.'

"The states, when organizing, ordained and established their Constitutions. In Mississippi, the powers of government were bestowed upon three departments—legislative, judicial, and executive. Section 33, art. 4, of Mississippi's Constitution, clearly announces that the legislative power of this state shall be vested in the legislature'. It is declared in section 5, art. 3, of the same

Constitution, that 'all political power is vested in, and derived from, the people; all government of right originates with the people, is founded upon their will only, and is instituted solely for the good of the whole.'

"It is, therefore, incumbent upon the Legislature to enact all laws necessary for regulating the conduct of the people and the proper use of their property. It is often true that persons will deem their liberties abridged, or the unlimited enjoyment of their property interfered with. Since the beginning of government this has been so. It will continue so long as persons decide from a selfish standpoint, and not from a consideration of the welfare of all citizens. It is the duty of the Legislature to consider the interests of all—what is best for society generally. As seen in the foregoing quotation from our state Constitution, it is enjoined upon the lawmakers that 'government is instituted solely for the good of the whole'. They are necessarily the judges of what is for the good of the citizens.

"Seeing that the power to enact necessary and proper laws is granted to the Legislature, and the legislators in the very nature of the case must decide what are such laws, then it is plain that the courts should be very careful before holding that any law passed touching the welfare of the citizens is [not] within the limits of the Constitutions. The duty of the court is to construe the law and apply it to the case presented, and it may decide that it is contrary to the fundamental laws, which we call our Constitutions. But it is not for the court to decide whether a law is needed and advisable in the general government of the people. This is being more and more recognized by the courts in their consideration of questions of constitutionality. In a recent case, Noble State Bank v. Haskell, 219 U. S. 104, 31 S. Ct. 186, [55 L. Ed. 112], 32 L. R. A., N. S., 1062, Ann. Cas. 1912A, 487, the United States Supreme Court, speaking through Mr. Justice Holmes, said: 'In answering that question, we must be cautious about pressing the broad words of the four-

teenth amendment to a dryly logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guaranties in the Bill of Rights. They more or less limit the liberty of the individual, or they diminish property to a certain extent. We have few scientifically certain criteria of legislation, and, as it often is difficult to mark the line where what is called the police power of the states is limited by the Constitution of the United States, judges should be slow to read into the latter a nolumus mutare as against the lawmaking power.'

"It is certainly true that the power of the state to enact laws for the government of its people, which is usually called the police power of the state, extends at least to the lives, the health, the general welfare and safety of the public, and against the wrongful or injurious exercise by any citizen of what he may deem his rights. The Supreme Court of the United States has 'with marked distinctness and uniformity recognized the necessity growing out of the fundamental conditions of civil society of upholding state police regulations which were enacted in good faith, and had appropriate and direct connection with that protection to life, health, and property which each state owes to her citizens.' Patterson v. [State of] Kentucky, 97 U. S. 501, 24 L. Ed. 1115.

"It was not the purpose of the fourteenth amendment to prevent in any manner the state from making the proper regulations for the promotion of the health, peace, morals, education, and good order of the people. Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923. Of course, the state cannot by its laws unduly and unnecessarily interfere with a person in the exercise of his inherent rights or the unlimited control and use of his property. At the same time it must be borne in mind that the rights of an individual must at all times be subordinate to the welfare and best interests of society. . . .

"The controlling question in this case is whether the law before us is for the welfare of the people, and whether it will promote the health, morals, and good order of the people affected; in other words, whether it will be a benefit to them.

"It is said in the case of Gundling v. [City of] Chicago, 177 U. S. 183, 20 S. Ct. 633, 44 L. Ed. 725, that 'regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country, and what such regulations shall be, and to what particular trade, business, or occupation they shall apply, are questions for the state to determine, and their determiation comes within the proper exercise of the police power by the state, and, unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizens are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend beyond the power of the state to pass, and they form no subject for federal interference.' "

The case of Wilby v. State, cited in the majority opinion, did not involve any statute which undertook to regulate a plumber or the plumbing business. It involved solely a statute of Mississippi which levied a privilege tax upon "each individual, firm or corporation doing a plumbing business in cities or towns of ten thousand or more inhabitants, where they have waterworks and sewerage." Code 1906, § 3854. Wilby was indicted and convicted for a violation of this statute. Upon appeal this court stated, "It does not appear from this record that Mr. Wilby was engaged in the business of making plumbing contracts and employing others to do or assist him in doing the work. He had no established place of business in which he kept plumbing supplies for the purpose of furnishing the material to carry out contracts. He was merely a practical plumber, doing such work as he obtained to do himself, performing his own labor, main-

taining no bureau for the purpose of obtaining contracts and employing others to do the work or to assist him in doing it, but was simply engaged in making a living by working at his trade from day to day, taking such contracts and doing such work in this line as he found to do.'' Upon these facts the court simply held that Wilby was not doing ''a plumbing business'' within the meaning of the privilege tax law, and that the tax applies only to those who maintain a place of business and carry supplies and engage others to do the work in connection with carrying out their contracts.

If the Wilby case is construed as holding that the business of plumbing cannot be regulated by the legislature, we still have the Clark case, supra, holding that barbers can be regulated, and it seems reasonable to me that public accountants, whose business requires special skill, training and knowledge, should at least be placed on the upper level with the barbers instead of on the lower level with the plumbers.

For the foregoing reasons I feel that the Mississippi statute defining and regulating public accountancy as particularly set out in Section 8912 is a proper exercise of the police power of the state in the interest of the public welfare and therefore I respectfully dissent from the views expressed in the controlling opinion.